# In the United States Court of Federal Claims

No. 14-0204C
(Filed: March 14, 2016)

|  |  |
|---|---|
| JOHN G. HAVRILLA, et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> THE UNITED STATES OF AMERICA, ) <br> ) <br> Defendant. ) <br> ) | Keywords: Motion for Summary Judgment; Fair Labor Standards Act; 29 U.S.C. § 207(a); Meal Breaks; Predominant Benefit Analysis; De Minimis Interruptions |

*David Ricksecker*, with whom were *Gregory K. McGillivary* and *Theodore Reid Coploff*, Woodley & McGillivary LLP, Washington, DC, for Plaintiffs.

*Jana Moses*, Trial Attorney, Commercial Litigation Branch, with whom were *Steven J. Gillingham*, Assistant Director, *Robert E. Kirschman*, *Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, United States Department of Justice, Washington, DC, for Defendant.

**OPINION AND ORDER**

**KAPLAN, Judge.**

      Plaintiffs in this case are five employees of the United States Navy who work as "small arms repairers" at Joint Base Pearl Harbor-Hickam in Honolulu, Hawaii (Pearl Harbor-Hickam or "the base"). They brought this action pursuant to section 207(a) of the Fair Labor Standards Act (FLSA) claiming entitlement to backpay, liquidated damages, and other relief for overtime work they allegedly performed during their daily unpaid 30-minute meal period. See 29 U.S.C. § 207(a); see also Compl. ¶¶ 7–17, ECF No. 1.

      Currently before the Court is Plaintiffs' motion for partial summary judgment pursuant to Rule 56(a) of the Rules of the Court of Federal Claims (RCFC). The government has opposed Plaintiffs' motion and seeks an entry of summary judgment in its favor. For the reasons set forth below, Plaintiffs' motion for partial summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**. The government's motion for summary judgment is **DENIED**.

**BACKGROUND**[1]

I.   **Overview of Duties of Small Arms Repairers**

As noted, Plaintiffs are all currently employed as small arms repairers by the Department of the Navy, Pearl Harbor-Hickam Police Department. They each staff one of two "ready for issue" (RFI) rooms that are located in two separate buildings on the base. Boyman Dep. 21, Pls.' App. 21.[2]

Ready for issue rooms hold weapons as well as other equipment used by both civilian and military police officers employed or stationed at the base. See OPNAVINST 5530.13C at DEF-4, Pls.' App. 728 (defining "ready for issue storage" as "storage as specified in this instruction of a relatively small amount of weapons and ammunition for duty section police, security guards and response forces so that they are available for ready access"). Therefore, an RFI must be available and manned around the clock. Friedel Dep. 12, Pls.' App 135.

The weapons issued through the RFI at Pearl Harbor-Hickam include 9 mm pistols, M240 machine guns, M4 assault rifles, and shotguns. Id. at 28, Pls.' App. 151; see also Tulewa-Gibbs Dep. 42, Pls.' App. 670. The RFI also issues and stores equipment such as speed radar devices, breathalyzers, and night vision goggles, among other items. Tulewa-Gibbs Dep. 31, Pls.' App. 659.

According to Plaintiffs' undisputed testimony, the duties of the small arms repairers include guarding the RFI; performing inventories of weapons, ammunition and equipment; handling the check-in and check-out of weapons and equipment; maintaining supplies in the RFI; and cleaning the RFI. Trice Dep. 60–61, Pls.' App. 592–93; Tulewa-Gibbs Dep. 23–24, 59–60, Pls.' App. 651–52, 687–88; Hooker Dep. 12, 70, Pls.' App.

---

[1] The facts in this section are based on the affidavits, declarations, deposition transcripts, and other documentary evidence supplied by the parties in support of their summary judgment motions. Citations to deposition transcripts include the name of the witness, the page number within that witness's deposition transcript, and the corresponding page number within the Plaintiffs' Appendix (which contains all the transcripts relied on by both the Plaintiffs and the government). For example, "Friedel Dep. 28, Pls.' App. 151" means that the witness testifying was Chief Petty Officer Edward Friedel, and that the referenced testimony can be found on page 28 of the transcript of his deposition, which is also page 151 of the Plaintiffs' Appendix. Where a fact is in dispute, it is noted.

[2] Plaintiffs Havrilla, Kamlangek, Trice, and Tulewa-Gibbs are assigned to the main RFI, which is located in Building 278. Friedel Dep. 11, 16, Pls.' App. 134, 139; Trice Dep. 7, Pls.' App. 539; Tulewa-Gibbs Dep. 10, Pls.' App. 638; Boyman Dep. 21–22, Pls.' App. 21–22. Plaintiff Erroll Hooker is assigned to the second RFI, which is located in Building 600 at West Loch Annex. Friedel Dep. 16, Pls.' App. 139; Hooker Dep. 16, Pls.' App. 328; Boyman Dep. 21, Pls.' App. 21. Prior to March 2013, Mr. Hooker was also assigned to the RFI in Building 278. Hooker Dep. 14, Pls.' App. 326.

324, 382; Havrilla Dep. 16, Pls.' App. 191; Kamlangek Dep. 39, Pls.' App. 469; see also Position Description, Pls.' App. 709–14; Def.'s Proposed Findings of Uncontroverted Fact (Def.'s Proposed Findings) No. 10, Def.'s Ex. 1 at 2 (noting that "Plaintiffs' responsibilities include guarding the RFI [and] issuing, maintaining, and receiving weapons and other equipment"); Boyman Dep. 80, Pls.' App. 80.

Similarly, Plaintiffs' position description (PD) states that small arms repairers are "responsible for the accountability, issue, receipt, cleanliness, minor maintenance, and serviceability of all weapons and ammunition located in the Installation Security Department RFI as well as any non-lethal weapons, personal protective equipment and law enforcement related equipment for which custody is assigned." Pls.' App. 710. The PD specifies that a small arms repairer "issues, receives, maintains, and restocks weapons, ammunition, non-lethal weapons, and personal protective equipment to security and law enforcement personnel as directed." Id. It further states that small arms repairers "perform[] frequent inventories" of weapons and other equipment in the RFI and are responsible for "routine non-depot level maintenance of weapons" as well as records management. Id. They must "maintain[] inventory levels of ammunition, gun cleaning supplies, targets, range apparatus and safety equipment, reordering when necessary." Id. Finally, the PD specifies that small arms repairers are required to be armed at all times while on duty. Id.

Small arms repairers at Pearl Harbor-Hickam are assigned to one of three 8.5-hour shifts that are scheduled for every 24-hour period. Friedel Decl., Def.'s Ex. 10 at 563 ¶ 5; Boyman Dep. 24–25, Pls.'s App 24–25. The shifts overlap by 30 minutes to allow the small arms repairers uninterrupted time to perform an inventory each time there is a shift change, as required by OPNAVINST 5530.13C ch. 2 § 0204. See Pls.' App. 740; see also Boyman Dep. 18–19, 62–63, Pls.' App. 18–19, 62–63. At Building 278, inventory typically takes 20 to 30 minutes. Trice Dep. 46, Pls.' App. 578; Tulewa-Gibbs Dep. 24–25, Pls.' App. 652–53. At Building 600, where fewer weapons are stored, the inventory typically takes 15 minutes. Hooker Dep. 42, Pls.' App. 354. Once the overlapping period ends, a small arms repairer generally works alone in the RFI.

Members of the base's police department do not take their weapons home. Therefore, they must go to the RFI at the beginning of their shifts to receive their weapons, and then must return their weapons to the RFI before departing. Friedel Dep. 36–37, Pls.' App. 159–60. As a result, each shift that the small arms repairer works experiences one or two rush periods, during which Plaintiffs check-in and check-out weapons and other small equipment on a continuous basis for approximately one hour. Kamlangek Dep. 53–56, 63–64, Pls.' App. 483–86, 493–94; Hooker Dep. 44, Pls.' App. 356. Employees also come to the RFI sporadically outside of these rush periods to get weapons and equipment, or to secure replacement batteries. Def.'s Ex. 10 at ¶ 5. Typically, Plaintiffs check-in and check-out up to twenty weapons or pieces of equipment per shift during non-rush periods. See, e.g., Trice Dep. 54, Pls.' App. 586; Hooker Dep. 48, 50–51, Pls.' App. 360, 362–63; Tulewa-Gibbs Dep. 29–30, Pls.' App. 657–58. It takes approximately two minutes to check-in or check-out a weapon. Hooker Dep. 46, Pls.' App. 358; Trice Dep. 54, Pls.' App. 586. It takes approximately a minute or less to issue a replacement battery. Trice Dep. 66–67, Pls.' App. 598–99; Kamlangek Dep. 53,

3

94–95, Pls.' App. 483, 524–25; Hooker Dep. 109–110, Pls.' App. 421–22; Tulewa-Gibbs Dep. 31–32, Pls.' App. 659–60.

As of July 2015, Plaintiffs were required to clean and maintain all the weapons in the RFI within a two-week timeframe. Friedel Decl., Def.'s Ex. 10 at 564 ¶ 7. Prior to July 2015, the maintenance schedule was on a monthly timetable. Id. Cleaning the weapons mostly involves wiping them down, which takes approximately two to five minutes for each weapon. Id. There is no daily quota imposed on the cleaning and maintenance of the weapons in the RFI. Id. Plaintiffs manage their own time during each shift regarding cleaning the weapons within the two-week maintenance schedule. Id. ¶ 8.

## II. Guard Duties

The RFI is staffed 24 hours a day, seven days a week by either a small arms repairer, a police officer, or a guard. Friedel Dep. 12, 14, Pls.' App. 135, 137; Boyman Dep. 23, 48, Pls.' App. 23, 48. All of the weapons and equipment in the RFI must be under proper watch at all times. Friedel Dep. 11, Pls.' App. 134 ("An RFI is not 100 percent secure, so there has to be someone on watch 24 hours a day."). Therefore, as noted, small arms repairers are required to be armed, and both the Plaintiffs and the government agree that one of their most important responsibilities is to "guard" the RFI during their shifts. See Pls.' Mem. of Points and Authorities in Supp. of Pls.' Mot. for Partial Summ. J. (Pls.' Mem.) at 4–5, ECF No 20-1; Def.'s Opp'n to Pls.' Mot. for Partial Summ. J. and Cross-Mot. for Summ. J. (Def.'s Opp'n) at 5, ECF No. 27; see also Trice Dep. 73, Pls.' App. 605; Tulewa-Gibbs Dep. 60, Pls.' App. 688; Boyman Dep. 84, Pls.' App. 84.

According to the testimony of Mr. Havrilla, the RFI at which he works is approximately 600–750 square feet in size. Havrilla Dep. 89–90, Pls.' App. 264–65. There is a single entrance door to the RFI, and there are three windows. Two of the windows are always locked; the third may be opened to allow the pick-up and return of weapons and other equipment. Id. at 90, Pls.' App. 265. The door is always kept locked, except when it is necessary to briefly open it because the particular weapon or piece of equipment being picked up or returned does not fit through the window. Id. When a small arms repairer leaves the RFI to use the restroom, he closes the window of the RFI, puts up a sign saying he will be right back, and locks the RFI, keeping the key with him. Id. at 95–96, Pls.' App. 270–71; see also Trice Dep. 35, Pls.' App. 567; Tulewa-Gibbs Dep. 60–61, Pls.' App. 688–89; Boyman Dep. 65, Pls.' App. 65; Hooker Dep. 74, Pls.' App. 386.

The rules and regulations for physical security of arms, ammunition, and explosives are set forth in OPNAV Instruction 5530.13C. Pls.' App. 715–826; see also Friedel Dep. 37–38, Pls.' App. 160–61. Under the Instruction, "an armed guard or watchstander, with communication equipment to summon assistance," must "be within sight of the storage container or [RFI] area(s) at all times." OPNAVINST 5530.13C ch. 2 § 0204(b), Pls.' App. 740. Further "[t]he guard or watchstanders' other duties, such as monitoring alarms, must not interfere with the ability to control access to the weapons." Id. Finally, the Instruction states that access to the area must be "strictly limited." Id.

According to Chief Petty Officer Edward Friedel, small arms repairers must maintain "constant surveillance" of the weapons in the RFI. Friedel Dep. 40, Pls.' App. 163. "Constant surveillance" means "maintaining continuous visibility of an item(s) or area, or of all means of access to the area, directly by personnel." OPNAVINST 5530.13C at DEF-2, Pls.' App. 726; see also Friedel Dep. 40, Pls.' App. 163.

### III.   Meal Periods

As noted above, Plaintiffs' scheduled shifts are 8.5 hours long.[3] One half-hour of each shift is designated as an unpaid meal period. Therefore, Plaintiffs receive 8 hours of pay for each 8.5-hour shift that they work.

Plaintiffs are not required to take their meal periods at a specific time. Friedel Dep. 26–27, Pls.' App. 149–50. Plaintiffs' deposition testimony indicates that they generally eat their meals during non-rush periods. Havrilla Dep. 121, Pls.' App. 296; see also Friedel Dep. 25–26, Pls.' App. 147–48. But regardless of when Plaintiffs choose to eat their meals, they are not relieved from their posts during that period, but are required to remain in or within sight of the RFI.[4] Tulewa-Gibbs Dep. 50, Pls.' App. 678; Havrilla Dep. 23–24, 121, Pls.' App. 198–99, 296; Kamlangek Dep. 91, Pls.' App. 521; Hooker Dep. 90, Pls.' App. 402. The general practice, therefore, is that small arms repairers eat lunch in the RFI. Friedel Dep. 24–25, Pls.' App. 147–48; Havrilla Dep. 121, Pls.' App. 296.

Plaintiffs are required to continue to guard the weapons and other equipment in the RFI and to provide assistance to law enforcement officers who come to the RFI's window throughout their shifts, including through their half-hour unpaid meal period. Trice Dep. 62, Pls.' App. 594; Hooker Dep. 109, Pls.' App. 421; Friedel Dep. 24–25, Pls.' App. 147–48. Although the number of such requests for assistance varies, on average one to three people will come to the RFI window to get weapons or equipment while a small arms repairer is eating a meal in the RFI. Trice Dep. 65–66, Pls.' App. 597–

---

[3] Civilian police and guards employed by the defendant at Joint Base Pearl Harbor-Hickam receive 30 minutes of overtime pay each shift for working all 8.5 hours. Hooker Dep. 112, Pls.' App. 424; Boyman Dep. 70–71, Pls.' App. 70–71; Havrilla Dep. 129–30, Pls.' App. 304–05. According to Plaintiffs, when police and guards work shifts in the RFI for 8.5 hours, they are paid for 8.5 hours, including 30 minutes of overtime. Hooker Dep. 112–13, Pls.' App. 424–25; Havrilla Dep. 129–30, Pls.' App. 304–05. The base's Senior Civilian Security Officer, Brian Boyman, acknowledged this practice, attributing it to the settlement of a union grievance. Boyman Dep. 70, Pls.' App. 70.

[4] The government submitted a declaration from Chief Friedel which indicated that Plaintiffs also had the option of eating their lunches in a break room adjacent to the RFI, so long as they kept the RFI in view and under constant surveillance. Def.'s Ex. 10 at 564 ¶ 9. Plaintiffs deny that they have ever been advised that they have the option of eating their meals in the break room. See Kamlangek Dep. 91, Pls.' App. 521; Trice Dep. 62, Pls.' App. 594.

98; Hooker Dep. 110, Pls.' App. 412; Kamlangek Dep. 70, Pls.' App. 500. These interruptions are brief—lasting one or two minutes. Trice Dep. 67, Pls.' App. 599.

There is a refrigerator and a microwave in the RFI. Friedel Decl., Def.'s Ex. 10 at 564 ¶ 10. There is also a television with cable channels and a computer with internet access. Havrilla Dep. 91–92, Pls.' App. 266–67. According to the government, "[d]uring meal periods, [P]laintiffs may eat, read, use the telephone, watch television, use the computer, or generally utilize the time to pursue other personal interests, e.g., playing musical instruments." Def.'s Proposed Findings No. 23, Def.'s Ex. 1 at 4 (citing Kamlangek Dep. 59, Pls.' App. 489; Hooker Dep. 71–73, Pls.' App. 383–85); see also Molettieri Decl., Def.'s Ex. 11 ¶ 7; Boyman Decl., Def.'s Ex. 12 at 569 ¶ 8. Plaintiffs do not dispute this assertion but emphasize that even as they are pursuing these other activities, they must also perform their duties of guarding the RFI and responding to requests for assistance from personnel seeking to check out or check in weapons and equipment. Pls.' Reply to Def.'s Opp'n to Pls.' Summ. J. Mot. and Opp'n to Def.'s Cross-Mot. for Summ. J. (Pls.' Reply) at 4, ECF No. 28.

There is some dispute in the record as to whether the Plaintiffs have ever been advised that they are required to take a meal break and whether there exists (and/or whether Plaintiffs have ever been made aware of) a process for Plaintiffs to request to be relieved in order to leave the RFI during their meal breaks. Plaintiffs claim that they have never been given any direction that they must take a meal period and also that they have never been told about any process for them to ask to be relieved during their lunch periods. Tulewa-Gibbs Dep. 60, 69, Pls.' App. 688, 697; Hooker Dep. 89, Pls.' App. 401; Kamlangek Dep. 49, 91–92, Pls.' App. 479, 521–22; Havrilla Dep. 99–101, Pls.' App. 273, 275–76.

The government contends, on the other hand, that during their orientation, Plaintiffs were explicitly directed that they were required to take a half-hour meal period during their shifts. Def.'s Proposed Findings No. 19, Def.'s Ex. 1 at 3; Boyman Dep. 45, Pls.' App. 45. It also contends that Plaintiffs are expected to notify their supervisors if they do not get a meal break. Def.'s Proposed Findings No. 28, Def.'s Ex. 1 at 4 (citing Boyman Dep. 53, Pls.' App. 53). Further, as the government notes, at least one Plaintiff, Mr. Hooker, has several times been relieved and given permission by his watch commander to leave the RFI for a meal break. Def.'s Opp'n at 22; see also Hooker Dep. 74–80, Pls.' App. 386–92. In addition, Officer Boyman, testified that he had observed employees turning their keys in to the watch commander and heading off to McDonald's for lunch. Boyman Dep. 58, Pls.' App. 58. Finally, David Molettieri, the base's former Non-Guard Service Administrative Supervisor, asserted in a declaration that he has observed the small arms repairers leaving to make food runs, which he understood was approved by their supervisor. Def.'s Ex. 11 at 567. The logbooks produced by the government in discovery, however, do not reveal any occasions in which the Plaintiffs were relieved for meal periods during their shifts. See Logbook Examples, Pls.' App. 827–56.

### IV. Plaintiffs' Communication of their Concerns and Management's Response

Plaintiffs' chain of command begins with their first line supervisor, Chief Friedel. Boyman Dep. 13, Pls.' App. 13; Friedel Dep. 47, Pls.' App. 170. Above Chief Friedel, on the military side of the chain of command, are a Lieutenant Commander, a Lieutenant Colonel, and the Joint Base Commander. Friedel Dep. 47, Pls.' App. 170. Plaintiffs are also supervised on each shift by a civilian watch commander and/or a shift sergeant. Boyman Dep. 80–82, Pls.' App. 80–82; Hooker Dep. 12–13, Pls.' App. 424–25; Kamlangek Dep. 37–38, Pls.' App. 467–68.

According to Plaintiffs, they raised issues with their supervisors about their unpaid meal periods on a number of occasions. Plaintiff Robert Trice, for example, testified that he complained to Chief Friedel regarding the Navy's failure to provide him with a duty-free meal period. Trice Dep. 38, 89–90, Pls.' App. 570, 621–22. According to Mr. Trice, Chief Friedel responded that it was "out of his hands" and that he "couldn't do anything about it." Id. at 90, Pls.' App. 622. Mr. Trice further stated that he also complained to Chief Friedel's predecessor, Chief Ware, about not getting a duty-free, 30-minute meal period, and asked if the small arms repairers could be relieved so that they could have a duty-free meal period. Id. at 40–41, 68–71, Pls.' App. 572–73, 600–03. He states that Chief Ware also told him that that there was "nothing he could do." Id. at 68–71, Pls.' App. 600–03.

Plaintiff Trice testified that he also asked supervisor David Molettieri if he should be paid for an additional 30 minutes per day and that Mr. Molettieri told him that the Navy would not pay the small arms repairers for working during their meal periods. Id. at 72–74, Pls.' App. 604–06. According to Mr. Trice, Mr. Molettieri told him that was "just the way it is" and that he was "not going to get paid" for his additional work. Id. at 74–75, Pls.' App. 606–07. Plaintiff Trice also complained to another former supervisor, Chief Snyder, that he was working 8.5 hours and only being paid for 8 hours. Id. at 86–87, Pls.' App. 618–19. Chief Snyder told Plaintiff Trice that there was "nothing he was able to do" about it. Id.

Similarly, Plaintiff Tulewa-Gibbs testified that he asked Chief Snyder why he was not being relieved or paid for the time he spent working during his meal period. Tulewa-Gibbs Dep. 47–48, Pls.' App. 675–76. Chief Snyder allegedly told Mr. Tulewa-Gibbs that it was "out of his hands." Id. at 49, Pls.' App. 677. According to Mr. Tulewa-Gibbs, he also asked Mr. Molettieri why he was not being relieved to take a meal period and was told that the small arms repairers should ask the watch captains, but that if he "couldn't work something out with the watch captains, [he] couldn't be relieved." Id. at 57, Pls.' App. 685. Subsequently, Mr. Tulewa-Gibbs asked Watch Commander Captain Souza if he could be relieved from the RFI so that he could take lunch. Id. at 50, Pls.' App. 678. Captain Souza told Mr. Tulewa-Gibbs that she did not have the personnel to relieve the small arms repairers. Id. at 58, Pls.' App. 686. Mr. Tulewa-Gibbs also notified another supervisor, Lieutenant Bright, that he was working through his meal period each shift and was not being relieved for lunch. Id. at 54, Pls.' App. 682.

Case 1:14-cv-00204-EDK Document 31 Filed 03/14/16 Page 8 of 19

Plaintiff Hooker testified that he told Chief Friedel that he was working through his lunch and that, in his view, he should be paid for his meal period. Hooker Dep. 114–15, Pls.' App. 426–27. Mr. Hooker also complained to Chief Friedel about the fact that guards were getting paid for 8.5 hours when assigned to the RFI while the small arms repairers were not, notwithstanding that the small arms repairers performed the same tasks as the guards and were also tasked with cleaning and maintaining the weapons. Id.

Plaintiff Havrilla testified that when he first began as a small arms repairer he specifically asked the watch commander, Captain Tanaka, why he was only being paid for 8 hours when he was working 8.5 hours. He states that Captain Tanaka told him "that those were my duty hours and there wasn't a whole lot he could do about the way the computer interpreted the work hours, because he inputs the time into the computer and he said that's the way it is." Havrilla Dep. 99, Pls.' App. 274; see also id. at 122–23, Pls.' App. 297–98.

Plaintiff Peerawut Kamlangek testified that he told Chief Snyder that he was working during his lunch and wanted to be paid for that work time. Kamlangek Dep. 85, Pls.' App. 515. According to Mr. Kamlangek, Chief Snyder said he would "look into" the issue, but that he did not make any changes. Id. at 87, Pls.' App. 517.

Senior Civilian Security Officer Boyman testified that small arms repairers were to notify their supervisor if they were not relieved for a meal period in order to receive compensation. Boyman Dep. 55, Pls.' App. 55. He further stated that, in his view, if the small arms repairer did not notify his supervisor that he had not been relieved for lunch, the Navy had no obligation to provide compensation. Id. at 56, Pls.' App. 56. Officer Boyman further testified that he understood that if a supervisor observed the small arms repairer working during his lunch, the supervisor had no duty to ensure that the employee was compensated for that work time. Id. at 56–57, Pls.' App. 56–57. Similarly, Officer Boyman testified that unless there was an emergency or an employee notified his supervisor that he worked through his meal period, the employee did not need to be paid for the time that he worked during his meal period, even if the employee's supervisor was aware that the employee performed uncompensated work. Id. at 93–95, Pls.' App. 93–95.

**V.    The Navy's Actions to Ensure Compliance with the FLSA**

Chief Friedel testified that he has never received any training in the Fair Labor Standards Act. Friedel Dep. 9–10, Pls.' App. 132–33. Similarly, Officer Boyman, who was designated as the official responsible for FLSA compliance at the base, testified that he had never had any formal FLSA training, although he had received one hour of informal training concerning FLSA exemption issues in the month prior to his deposition. Boyman Dep. 14, 16, Pls.' App. 14, 16. Officer Boyman also testified that he did not know whether the Navy had ever sought a legal opinion regarding whether the small arms repairers should be compensated for their 30-minute meal period. Id. at 89, Pls.' App. 89.

In a declaration, Mr. Molettieri, asserted that in 2012 he reviewed Office of Personnel Management (OPM) regulations and concluded that the small arms repairers were not entitled to overtime compensation for their 30-minute meal periods because, in

his view, they had been offered an opportunity to have "uninterrupted meal periods." Def.'s Ex. 11 at 567 ¶ 4. The declaration does not indicate whether or not Mr. Molettieri is trained or otherwise qualified to interpret the FLSA. Plaintiffs, however, have submitted an excerpt from a transcript of testimony that Mr. Molettieri gave in another matter in 2014, in which he stated that he could not recall ever receiving such training. See Suppl. App. to Pls.' Mot. for Partial Summ. J. (Pls.' Suppl. App.) 888, ECF No. 28-1.

**VI.     This Action**

Plaintiffs brought this action on March 12, 2014. They claim that the Navy willfully violated the FLSA by allegedly requiring them to work through their half-hour unpaid meal periods without providing them with overtime compensation (or indeed any compensation) for such work. They seek an award of backpay and liquidated damages for the three-year period prior to the filing of this suit.

After a period of discovery, Plaintiffs filed a motion for partial summary judgment as to liability on September 30, 2015. ECF No. 20. The government, in turn, filed a cross-motion for summary judgment on November 30, 2015, contending that Plaintiffs are not entitled to compensation for the additional half-hour per day set aside for a meal period. ECF No. 27. Oral argument was held on the cross-motions on March 2, 2016, and they are now ripe for disposition.

**DISCUSSION**

**I.      Jurisdiction**

The Tucker Act grants the Court of Federal Claims jurisdiction over non-tort monetary claims "against the United States founded . . . upon . . . any Act of Congress." 28 U.S.C. § 1491(a)(1). It is well established that a claim against the government under the monetary-damages provision of the FLSA, 29 U.S.C. § 216(b), is within this Court's Tucker Act jurisdiction. E.g., Abbey v. United States, 745 F.3d 1363, 1369 (Fed. Cir. 2014). Accordingly, this Court has jurisdiction over Plaintiffs' FLSA claims in this matter.

**II.     Summary Judgment Standards**

In accordance with RCFC 56(a), summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the burden of establishing the absence of any genuine issue of material fact, and all significant doubts regarding factual issues must be resolved in favor of the party opposing summary judgment. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Summary judgment may be entered against a party that fails to make a showing sufficient to establish the existence of an element

essential to its case, and on which that party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." Mingus Constructors, Inc., 812 F.2d at 1391. Further, the court should act with caution in granting summary judgment and may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

### III. The Plaintiffs are Entitled to Summary Judgment as to Their Claim that the Navy Violated the FLSA By Automatically Deducting One Half-Hour From Plaintiffs' Shifts for an Unpaid Meal Break

29 U.S.C. § 207(a)(1) provides that "no employer shall employ any of his employees who in any workweek is engaged in commerce . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." "Employ" includes to suffer or permit to work. Id. § 203(g). In this case, Plaintiffs' central assertion is that Pearl Harbor-Hickam's unpaid meal break policy is a per se violation of the FLSA because the small arms repairers are suffered or permitted to work throughout their 8.5-hour shifts but are only paid for 8 hours of work.

The government, on the other hand, contends that the Plaintiffs are due no compensation for their 30-minute meal periods. It argues that the Plaintiffs have "ample time" during their work day to take a meal break and that any work-related interruptions to Plaintiffs' half-hour meal break were de minimis in nature and therefore not compensable. According to the government, the half-hour meal break should not be considered hours of work because the benefit of Plaintiffs' time during the break does not inure predominantly to the Navy; rather, according to the government, Plaintiffs are free to engage in a variety of purely personal pursuits during their meal breaks so long as they remain in or within sight of the RFI to guard its contents and respond to infrequent requests for assistance.

For the reasons set forth below, the Court concludes that the Navy suffered or permitted the Plaintiffs to work throughout their entire 8.5-hour shifts, including the half-hour period that the Navy automatically deducted as an unpaid meal period. Accordingly, the Plaintiffs are entitled to summary judgment as to their claim that the Navy violated the FLSA by failing to compensate them for work performed throughout their shifts, including the half-hour automatically deducted meal period.

### A. Plaintiffs Performed Work Throughout Their Entire Shifts, Including the Half-Hour "Meal Break"

As noted, the FLSA requires employers to pay overtime compensation for work performed in excess of a forty-hour workweek. Id. § 207(a)(1). The FLSA does not contain any definition of the term "work," but the term's meaning can be derived from

the case law and applicable regulations. In Armour & Co. v. Wantock, the Supreme Court observed that "work or employment . . . as those words are commonly used" means "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." 323 U.S. 126 at 132 (1944) (quoting Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 598 (1944)). The Court further observed that the issue of whether an employee was performing compensable "work" at any particular time is highly fact specific and depends upon an examination of the totality of the circumstances. See id. at 133; see also Skidmore v. Swift, 323 U.S. 134, 136–37 (1944) ("Whether in a concrete case such time falls within or without the Act is a question of fact to be resolved by appropriate findings of the trial court.").

The Office of Personnel Management is responsible for administering the FLSA in the federal sector. 29 U.S.C. § 204(f); see also Billings v. United States, 322 F.3d 1328, 1331 (Fed. Cir. 2003). OPM's regulations are required to "harmonize with the statute's 'origin and purpose' . . . as well as with the Secretary of Labor's regulations." Billings, 322 F.3d at 1334 (Fed. Cir. 2003) (omission in original) (quoting Zumerling v. Devine, 769 F.2d 745, 750 (Fed. Cir. 1985)).

Pursuant to OPM's regulations, "[h]ours of work means all time spent by an employee performing an activity for the benefit of an agency and under the control or direction of the agency." 5 C.F.R. § 551.104. Such time includes: "(1) [t]ime during which an employee is required to be on duty; (2) [t]ime during which an employee is suffered or permitted to work; and (3) [w]aiting time or idle time which is under the control of an agency and which is for the benefit of an agency." Id. § 551.401(a).

OPM has not issued any regulations that govern the application of these general principles to unpaid meal periods. The Department of Labor (DOL), however, has issued such a regulation—29 C.F.R. § 785.19. That regulation, entitled "Meal," states as follows:

> Bona fide meal periods are not worktime. Bona fide meal periods do not include coffee breaks or time for snacks. These are rest periods. The employee must be completely relieved from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period. A shorter period may be long enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating.

Id. § 785.19(a). It is beyond dispute that Plaintiffs would prevail on their motion for partial summary judgment if the Court applied the standard articulated in DOL's regulation because Plaintiffs are not "completely relieved from duty" during their meal periods. To the contrary (other than bathroom breaks) they are required to remain in or

11

within sight of the RFI throughout their entire 8.5-hour shift to guard it and to issue and receive weapons and other equipment.[5]

As DOL itself has acknowledged, however, the "ultimate decisions on interpretations of the [FLSA] are made by the courts." 29 C.F.R. § 785.2 (citing Skidmore, 323 U.S. at 140 (holding that the DOL Administrator's interpretations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance")). Moreover, the circuit courts of appeals that have considered the issue have rejected the "complete relief" standard articulated by section 785.19. Instead, they have adopted a standard consistent with Skidmore and other FLSA precedent that examines the totality of the circumstances to determine whether the employee spends his meal period engaged in activities that are predominantly for his own benefit or activities that instead inure predominantly to the benefit of his employer. E.g., Reich v. S. New Eng. Telecomms. Corp., 121 F.3d 58, 64 (2d Cir. 1997); Roy v. Cty. of Lexington, 141 F.3d 533, 540–41 (4th Cir. 1998); Bernard v. IBP, Inc., 154 F.3d 259, 264–65 (5th Cir. 1998); Hill v. United States, 751 F.2d 810, 814 (6th Cir. 1984); Alexander v. City of Chicago, 994 F.2d 333, 337 (7th Cir. 1993); Henson v. Pulaski Cty. Sheriff Dep't, 6 F.3d 531, 534 (8th Cir. 1993); Lamon v. City of Shawnee, 972 F.2d 1145, 1155–56 (10th Cir. 1992); Kohlheim v. Glynn Cty., 915 F.2d 1473, 1477 & n.19 (11th Cir. 1990).

The circuits are split as to whether the employer bears the burden of showing that the meal time predominantly benefits the employee or vice versa. Naylor v. Securiguard, Inc., 801 F.3d 501, 508 (5th Cir. 2015) (employer has burden); Roy, 141 F.3d at 544 (same); Hertz v. Woodbury Cty., 566 F.3d 775, 783–84 (8th Cir. 2009) (burden of proof on employee); Ruffin v. Motor City Casino, 775 F.3d 807, 811 (6th Cir. 2015) (same). In this case, regardless of which party bears the burden of proof, the Court concludes that the undisputed facts establish that Plaintiffs are required to spend their entire shift, including their half-hour "meal break," engaged in activities that predominantly benefit their employer. Therefore, the Court concludes that, as a matter of law, Plaintiffs are entitled to compensation for the half-hour "meal breaks" during which they are required to remain in the RFI (or in an immediately adjacent break room) to guard the RFI and respond to requests to return or check out weapons and equipment.

To begin with, there is no dispute that under Navy policy, unless specifically relieved of duty by a supervisor, Plaintiffs are not permitted to leave the RFI for any period of time during their 8.5-hour shifts, except to take brief bathroom breaks. Nor is it disputed that Plaintiffs are required not only to remain at their worksites, but also to perform two core duties of their positions—guarding the RFI and responding to requests

---

[5] As noted above, the parties dispute whether Plaintiffs have the option of taking their meal breaks in an adjacent break room, rather than in the RFI. The Court does not consider this factual dispute a material one, as the government concedes that even if Plaintiffs choose to use the break room, they must continue to keep the RFI under surveillance and be available to assist officers seeking to return or check out weapons and equipment. See Oral Argument at 34:50–35:10 (Mar. 2, 2016).

to check in and check out weapons and equipment—throughout their entire 8.5-hour shifts. This policy predominantly benefits the Navy because it enables the Navy to enjoy the full 8.5 hours of labor required to run the RFI without diverting additional personnel to relieve Plaintiffs.

In that respect, the Court finds distinguishable cases in which courts have declined to order overtime pay to security guards who are required to remain on the employer's premises during their unpaid meal breaks and to carry a radio or be otherwise available for emergency calls. E.g., Agner v. United States, 8 Cl. Ct. 635, 638 (1985) aff'd, 795 F.2d 1017 (Fed. Cir. 1986) ("[T]he mere fact that an employee is required to eat lunch on the employer's premises and to be on a duty status, subject to emergency call during such period, does not convert this private leisure time into compensable time." (alteration in original) (quoting Baylor v. United States, 198 Ct. Cl. 331, 364 (1972))). Plaintiffs here are not merely required to remain on their employer's premises—i.e., the base; they are required to remain at their worksite, the RFI.

Further, Plaintiffs are not free to engage in personal pursuits in the same sense as the security guards who remained on call throughout their meal periods to respond to emergencies. Rather, Plaintiffs are confined to the RFI (or its immediate vicinity) and are required to perform essentially the same duties that they perform for the rest of their shifts during their supposed meal breaks. Thus, Plaintiffs are not merely "on call" during their meal breaks; they are on duty. The Navy, in other words, has imposed the requirement that Plaintiffs remain in the RFI "as an indirect or round-about way of extracting unpaid work from [them]." Ruffin v. MotorCity Casino, 775 F.3d 807, 814 (6th Cir. 2015).

The government emphasizes that despite the fact that Plaintiffs are required to remain in the RFI for their entire shifts, during non-rush times they are interrupted only infrequently to respond to requests to return or check out weapons. According to the government, these interruptions are "de minimis" and do not require that the meal period be treated as work time for purposes of the FLSA. Def.'s Opp'n at 10. The problem with this argument is that, under the circumstances of this case, the time Plaintiffs spend "waiting" to be interrupted (whether by a potential intruder or a police officer seeking to return or receive a weapon or equipment) is itself time spent working. As the Supreme Court observed in Armour:

> [A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer.

323 U.S. at 133; see also Skidmore, 323 U.S. at 135 (distinguishing between employees who have been "engaged to wait" and those who are "wait[ing] to be engaged"); Myracle v. Gen. Elec. Co., 33 F.3d 55, at *5 (6th Cir. 1994) (observing that "the crucial question

13

is whether Plaintiffs are engaging in substantial duties during their meal periods," and noting that "substantial duties need not be more than waiting for something to happen, or '[r]eadiness to serve'" (alteration in original) (quoting Armour, 323 U.S. at 133)); 5 C.F.R. § 551.401(a) (hours of work includes "[w]aiting time or idle time which is under the control of an agency and which is for the benefit of an agency").

In this case, an integral part of Plaintiffs' jobs is to "wait for something to happen," whether it be a threat to the RFI's security or a request for assistance from an officer or officers in need of weapons or equipment. See Armour, 323 U.S. at 133. A determination of whether Plaintiffs are working during their ostensible "meal breaks" does not, therefore, depend upon how often that "something" actually does happen. Indeed, the upshot of the government's argument that Plaintiffs are not performing any "work" during these unpaid "meal breaks" is that Plaintiffs are not performing work during any of the "non-rush" hours of their shifts unless they are cleaning or maintaining the weapons.

Further, the fact that the Navy supplied a television set and a computer for Plaintiffs' use in the RFI does not transform their time confined to the RFI into time that predominantly benefits Plaintiffs, as opposed to the Navy. Indeed, there is nothing in the record that suggests that Plaintiffs are precluded from watching television or using the computer during any part of their shifts when guarding the RFI or otherwise waiting to provide assistance to base law enforcement personnel.

Finally, the Court finds it significant that if the Navy did not require Plaintiffs to remain in the RFI for their entire shifts to guard it and assist law enforcement officers seeking to return or check out weapons and equipment, the Navy would have had to hire someone else to perform those duties. In short, "[b]y not compensating these workers, [the Navy] is effectively receiving free labor." Reich, 121 F.3d at 65. Because the undisputed facts in this case establish that Plaintiffs' entire 8.5-hour shifts are spent in activities that predominantly benefit the Navy, rather than the Plaintiffs, the Court concludes that the entirety of the shifts constituted compensable work time.

### B. The Navy Suffered and Permitted Plaintiffs' Work

The government contends that even if the Court finds that Plaintiffs were performing work throughout their 8.5-hour shifts, Plaintiffs have not shown that the Navy knew or should have known that such work was being performed. In other words, according to the government, Plaintiffs have not demonstrated that they were "suffered or permitted to work" within the meaning of the FLSA. See 5 C.F.R. § 551.104 (defining "suffered or permitted work" as "any work performed by an employee for the benefit of an agency, whether requested or not, provided the employee's supervisor knows or has reason to believe that the work is being performed and has an opportunity to prevent the work from being performed").

The government's argument on this point is essentially that the Navy was not aware that Plaintiffs were working through their meal breaks because Plaintiffs made no "actual statements to supervisors that they had missed meal breaks, and, therefore, were

entitled to overtime compensation." Def.'s Opp'n at 18. But contrary to the government's argument, it is undisputed that Plaintiffs explicitly complained to supervisors on a number of occasions that they were being required to work 8.5 hours for only 8 hours of pay.

More to the point, even if Plaintiffs had never raised the issue, the government's argument that Plaintiffs were not suffered or permitted to work lacks merit for the same reason that its argument regarding the compensability of the "meal breaks" lacks merit. The question for purposes of determining whether the Navy suffered or permitted Plaintiffs to work is whether the Navy knew (or should have known) that Plaintiffs were in the RFI throughout their entire 8.5-hour shifts, guarding it and responding to requests to return or check out weapons and equipment. It is not disputed that Plaintiffs supervisors knew this; indeed, it was Navy policy that Plaintiffs could leave the RFI only if they specifically obtained relief from a supervisor.

In short, to the extent that Navy officials can be said to have been ignorant of the fact that Plaintiffs were "working" through their entire shifts, such ignorance was a reflection of their misapprehension of the law—that is, their failure to appreciate that guarding the RFI and being available to respond to requests for assistance constitutes "work" under the FLSA. Therefore, the Court **GRANTS** Plaintiffs' motion for summary judgment as to the government's liability to provide overtime compensation to Plaintiffs under the FLSA for work performed throughout their shifts, with no automatic half-hour deduction for an unpaid meal period.

### C. Plaintiffs are Entitled to Summary Judgment as to their Request for an Award of Liquidated Damages

Pursuant to 29 U.S.C. § 216, damages for violations of the overtime provisions of the FLSA include "unpaid overtime compensation . . . [and] an additional equal amount as liquidated damages." However, "if the employer shows to the satisfaction of the court that the act or omission giving rise to [the violation of the FLSA] . . . was in good faith and that [the employer] had reasonable grounds for believing that [its] act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216." Id. § 260.

"Liquidated damages under the FLSA are considered compensatory rather than punitive in nature." Reich, 121 F.3d at 71 (citing Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 707 (1945)). "[U]nder 29 U.S.C. § 216(b), the presumption is that Plaintiffs are entitled to liquidated damages." Abbey v. United States, 106 Fed. Cl. 254, 265 (2012), vac'd on other grounds, 745 F.3d 1363 (Fed. Cir. 2014). Thus, "[t]he burden rests on the government to establish its good faith and the reasonable grounds for its decision." Adams v. United States, 350 F.3d 1216, 1226 (Fed. Cir. 2003).

"The 'good faith' referred to in section 260 means 'an honest intention to ascertain what the [FLSA] requires and to act in accordance with it.'" Beebe v. United States, 640 F.2d 1283, 1295 (Ct. Cl. 1981) (quoting Addison v. Huron Stevedoring Corp.,

15

204 F.2d 88, 93 (2d Cir. 1953), cert. denied 346 U.S. 877 (1953)). "Whether an honest intention existed, necessitates a subjective inquiry." Id. The determination as to whether the employer had reasonable grounds for believing that his act or omission was in compliance with the Act, on the other hand, involves an objective standard. Id. "Proof that the law is uncertain, ambiguous or complex may provide reasonable grounds for an employer's belief that he is in conformity with the Act, even though his belief is erroneous." Id.

In support of its contention that the Navy acted in good faith and that it had reasonable grounds for believing that its meal break policy complied with the Act, the government relies entirely on the declaration of Mr. Molettieri. Def.'s Ex. 11 at 566–67. Mr. Molettieri states that his responsibilities included "interviewing, hiring employees, ensuring employees are provided proper training, hearing and resolving employee grievances, and collecting, reviewing, documenting and recording employee time cards from their Operational Supervisors." Id. at 566 ¶ 1. According to Mr. Molettieri, in 2012 the small arms repairers "generally inquired about entitlement to overtime pay for their 30-minute meal periods." Id. at 567 ¶ 4. Mr. Molettieri states that he "consulted with each of them with relevant regulations, including [the] Office of Personnel Management's regulations, and informed the weapons handlers that they were not entitled to overtime pay for their 30-minute meal periods." Id. He explains that "this was due to all of them being afford [sic] the opportunity to have uninterrupted meal time periods which is the main reason to qualify or not qualify meal time period compensation." Id.

As noted above, it is appropriate to enter summary judgment against a party "that fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Here, the government has failed to make a showing sufficient to establish that it had "reasonable grounds for believing that its act or omission was in compliance with the Act." See 29 U.S.C. § 260.

First, the government has presented no evidence that Mr. Molettieri is the base's expert in FLSA matters or even that he has received any training in its requirements. Indeed, in responding to Plaintiffs' request under RCFC 30(b)(6), the government designated Officer Boyman, and not Mr. Molettieri, as the person responsible for ensuring the base's compliance with the FLSA. See Pls.' Suppl. App. 891. Further, Plaintiffs have introduced excerpts of testimony by Mr. Molettieri in 2014 in another proceeding in which he acknowledges that he is not an "HR expert" and that he had not received any training in the FLSA. Pls.' Suppl. App. 887–88.

In addition to failing to show that Mr. Molettieri was competent to interpret the FLSA, his declaration is less than informative with respect to the precise legal basis for his conclusion that Plaintiffs were not entitled to overtime pay for the half-hour of their shifts that the Navy designated as an unpaid meal break. Mr. Molettieri states only that he consulted "relevant regulations, including [the] Office of Personnel Management's regulations." Def.'s Ex. 11 at 567 ¶ 4. But he does not identify which OPM regulation he relied upon and, in fact, there are no OPM regulations that specifically address entitlement to compensation for meal breaks.

Moreover, the case law is settled that employees must receive compensation where the time attributed to their unpaid meal breaks was spent predominantly for their employer's benefit; there is no ambiguity in the law. To be sure, the question of whether a meal break was spent predominantly for an employer's benefit is a fact-specific one. But there is nothing in Mr. Molettieri's declaration to reflect that he even attempted such a fact-specific inquiry, much less anything explaining why such an inquiry would have led him to conclude that Plaintiffs could be denied compensation under the facts of this case. To the contrary, his declaration simply contains an elliptical conclusion that Plaintiffs were not entitled to overtime pay "due to all of them being afford [sic] the opportunity to have uninterrupted meal time periods which is the main reason to qualify or not qualify meal time period compensation." Id.

In short, the record contains insufficient evidence to show that the Navy had reasonable grounds for believing that its policies complied with the FLSA. Because the government bears the burden of proof on that issue for purposes of making the liquidated damages determination, the Court **GRANTS** Plaintiffs' motion for summary judgment on the issue of entitlement to liquidated damages.

### IV.   Summary Judgment is Not Proper as to Whether or Not the Navy's Violation was Willful within the Meaning of 29 U.S.C. § 255

The statute of limitations for bringing a claim under the FLSA is generally two years. 29 U.S.C. § 255(a). A three-year limitations period applies, however, if a plaintiff's claim arises out of an employer's "willful" violation of the FLSA. Id. Unlike the allocation of burdens with respect to liquidated damages, "the employee bears the burden of proving the willfulness of the employer's FLSA violations." Adams, 350 F.3d at 1229.

To determine whether an employer has committed a willful violation of the FLSA, the court examines whether "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988). "[C]onduct that is not merely negligent" is required, and "[i]f an employer acts unreasonably, but not recklessly, in determining its legal obligation," its action is not considered willful. Id. at 133 n.13.

The Court concludes that it would not be appropriate to enter summary judgment for either party with respect to the issue of willfulness. On the one hand, there is ample evidence in the record currently before the Court to suggest that the Navy personnel who were apparently responsible for ensuring FLSA compliance at the base were poorly trained for the task, and that Plaintiffs' supervisors were equally uninformed. The record also shows that Plaintiffs complained to a number of Navy supervisors about the Navy's failure to compensate them for their half-hour meal period and that no relief was forthcoming. But there is no evidence in the record that the individuals to whom Plaintiffs complained (or any other Navy officials) actually knew that Plaintiffs were

legally entitled to such compensation. The only piece of information that arguably suggests such knowledge is the fact that—apparently as a result of the settlement of a grievance—the Navy does provide 8.5 hours of compensation to security guards who on occasion substitute for small arms repairers. The record, however, does not reveal either the circumstances surrounding the grievances or the Navy's justification for the apparently disparate treatment of Plaintiffs.

In addition, the record before the Court on summary judgment does not enable the Court to determine whether or not the Navy acted with reckless disregard for its obligations because the Court cannot discern what actions, if any, Plaintiffs' supervisors took in response to Plaintiffs' complaints. Nor does the record indicate whether Plaintiffs' supervisors received instructions about how to respond to employees asserting that they were not being properly compensated. Instead, the record includes testimony by Plaintiffs that their supervisors responded to their complaints with words to the effect that there was nothing to be done or that the matter was out of their hands. In some instances, Plaintiffs allege, the supervisors told Plaintiffs that they would "look into it" but then never got back to Plaintiffs. In order to determine whether the Navy acted with a reckless disregard for its obligations, more detail and clarity is needed regarding what steps the supervisors or others took (or did not take) in response to Plaintiffs' complaints.

Finally, because intent is an element of the willfulness decision, "the state of mind of the government actors must be explored, and the court must have an opportunity to assess the credibility of those testifying about that state of mind." Moreno v. United States, 82 Fed. Cl. 387, 398 (2008). Because "[t]he court is not permitted to resolve such credibility issues at the summary judgment stage . . . a trial is necessary to explore the state of mind of the decision makers in this case." Id.

In short, the record is insufficient at this time to permit entry of summary judgment for either Plaintiff or the government as to whether the Navy acted with reckless disregard for its FLSA obligations. Accordingly, the Court **DENIES** both parties' motions for summary judgment with respect to the willfulness of the government's FLSA violations.

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion for partial summary judgment is **GRANTED-IN-PART** as to the government's liability for backpay and liquidated damages under the FLSA. Plaintiffs' motion is **DENIED** with respect to the issue of whether the FLSA violation was willful within the meaning of 29 U.S.C. § 255. The government's motion for summary judgment is **DENIED**.

The parties shall file a joint status report within 30 days of the date of this Order, proposing a schedule for further proceedings in this case.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge